UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF                                    CASE NUMBER:  05-10595

JOHNNIE LEE WILLIAMS AND
CHRISTINE BIRKS WILLIAMS                            CHAPTER 13

**MEMORANDUM OPINION**

Chapter 13 debtors Johnnie Lee Williams and Christine Birks Williams (collectively "the Williamses") object to the claim of Tower Credit ("Tower").  They allege that Tower:

(1) fraudulently obtained a mortgage on the debtors' home to secure the loan;

(2) claimed interest at a rate in excess of the maximum allowed by the Louisiana Residential Mortgage Lending Act; and

(3) improperly calculated (and as a result, improperly disclosed) the interest rate applicable to the loan by adding to the amount financed several soft cost items that should have been excluded from the calculation of the annual percentage rate.

Tower's properly completed claim, filed with supporting documents, is prima facie evidence of the validity of the claim.  11 U.S.C. §502(a); Fed. R. Bankr. P. 3001(f). Accordingly, the debtors bear the burden of proof on the objection.

For reasons set forth in this memorandum opinion, the Williamses' objection is overruled.

**FACTS**

Christine Williams telephoned Steven Binning ("Binning") at Tower, from which she and her husband had previously borrowed money, to borrow $1300 for a transmission for their 1996 Chevrolet Astro van.  Binning suggested that she borrow enough money to cover both the transmission repair and pay off debts she owed Tower.  The Williamses accepted Binning's suggestion, eventually signing the combination promissory note, truth in lending disclosure statement and security agreement ("note")[1] and an act of mortgage.[2]  The terms of the note detail that the loan was for $17,091.28, enough to repay other Tower debt and provide the Williamses with $1300 in cash.  Mrs. Williams acknowledged that Binning asked her to wait for three days before closing the loan, as evidenced by the Williamses' signatures on several disclosure documents informing them of their three day right to rescission[3] should they elect to forego the loan.[4]  Once the three day waiting period expired, Tower closed the loan.

**ANALYSIS**

**The debtors did not prove that Tower
fraudulently obtained a mortgage on their home.**

The debtors allege that Tower defrauded them into granting a mortgage on their home to secure the loan.  Mrs. Williams testified that she did not intend to borrow against her house, and that she and her husband would not have mortgaged their home for a mere

---

[1] Debtors' Exhibit A.

[2] Debtors' Exhibit C.

[3] 15 U.S.C. §1635(a).

[4] Tower Exhibits 1, 2 and 3.

2

$1300. Mrs. Williams also testified that Binning told her to sign the document "just in case."

Mrs. Williams's testimony is entirely incredible, and is contradicted by other evidence.

First, Mrs. Williams's claim that she would not have agreed to mortgage her home for $1300 is misleading. The evidence establishes that the mortgage secured a significantly larger sum than the $1300 to repair her van. Specifically, the note indicates that the Williamses paid Tower $11,015.45 ($3,192.77 and $7,822.68) from the loan proceeds.[5]

Moreover, Mrs. Williams admitted signing a document captioned "Act of Mortgage" in the presence of Binning and her husband, who also signed the document.[6] The debtors also signed a "Three-Day Prior Notice" form under HOEPA,[7] admitted into evidence as Tower Exhibit 1. That document conspicuously disclosed that the borrowers' residence would secure the loan, and in large type, capital letters, warned the debtors that they could lose their home if they did not fulfill their obligation to Tower. Finally, both debtors signed a document stating that Tower would hold a mortgage on their home if they completed the loan.[8] This documentary evidence alone refutes the debtors' claims,

---

[5] The transaction – in part, a refinancing – apparently retired other loans the Williamses owed Tower, although no party offered evidence of the purpose, date or current balances of the outstanding loans.

[6] Johnnie Lee Williams did not testify at the hearing.

[7] HOEPA is an acronym for the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. §§ 1602(aa), 1610, 1639, 1640. HOEPA amended TILA in 1994 and requires additional disclosures by lenders making certain high-cost loans secured by home mortgages. 15 U.S.C. §1639; *Bell v. Parkway,* 309 B.R. 139, 149 (Bankr. E.D. Pa. 2004).

[8] Tower Exhibit 2.

3

although debtors offered a hodgepodge of other evidence to suggest that alleged irregularities relating to the mortgage evidenced fraud.

For example, the debtors' contend in their memorandum that they believed that they were only giving Tower a security interest in household goods and a car.  In fact, the combined promissory note, truth-in-lending disclosure and security agreement provides for a security interest in specified movable property and a mortgage on the debtor's home.  The security agreement does not grant Tower a security interest in the debtors' car.

Next, Mrs. Williams contends that she signed a version of the mortgage document lacking a specific property description for her home.  Her testimony apparently was offered to support a claim that Tower supplied the property description necessary for an act of mortgage, and therefore somehow created a mortgage document without the debtors' consent.  This unsubstantiated theory is undermined by the evidence.  Specifically, Tower Exhibit 4 is a copy of the Sale with Assumption of Mortgage by which the debtors acquired their home in 1994.  That document bears no recordation information (indeed, it bears the signature of only Christine Williams), and apparently did not come from the public record.  Accordingly, the only reasonable inference from the evidence is that the debtors furnished the unsigned mortgage document to Tower in connection with this transaction.  This undermines Mrs. Williams's testimony that she had no idea how Tower obtained the legal description of their home, and in so doing, further discredits the debtors' claims that they did not grant Tower a mortgage on their home.

As further evidence of alleged irregularities associated with the mortgage, the debtors next argue that the paraph on the note contains an incorrect date, reading 2005

instead of 2004.  The debtors invite the court to speculate that the paraph was not made at the same time that the mortgage was notarized, though they offer no proof of their theory.

In any case, an incorrect paraph does not invalidate a mortgage: indeed, a note need not even be paraphed to validate a related mortgage.  Louisiana Civil Code art. 3325(A) states that "a note … which is secured by an act of mortgage … need not be paraphed for identification with such mortgage."  Article 3325(B) describes the method a notary must follow to paraph a note, but provides that a failure to correctly paraph the note merely renders the paraph ineffective: the mortgage which it identifies to the note remains valid.[9]

To summarize, Mrs. Williams's testimony that she did not know that she was granting a mortgage on her home is not credible.  Accordingly, the Williamses have not sustained their burden of proof to invalidate Tower's mortgage (or the claim it secures) on the basis of fraud.

### The debtors did not prove that Tower charged an excessive or usurious rate of interest on the loan.

The debtors next claim that the annual percentage rate[10] ("APR") Tower charged, 22.10%, is an excessive interest rate prohibited by the Louisiana Residential Mortgage Lending Act ("LRMLA").[11]  The act places limits on interest rates on loans for individual

---

[9] La Civil Code art. 3325(B).

[10] "The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate." 12 C.F.R. §226.14.  Disclosure of this rate is required by the Federal Truth-in-Lending Act, 15 U.S.C. §1601 *et seq.*

[11] La. R.S. 6:1081, *et seq.*

5

residences, specifically limiting such charges to the greater of either twenty one percent (21%) or the current Federal Reserve Discount Rate plus fifteen percent (15%).[12]

The mortgage securing the Williamses' loan is not subject to the LRMLA. Specifically, La. R.S. 6:1096 applies only to *residential mortgage loans*, defined in La. R.S. 6:1083(12) as either: (a) "federally related mortgage loans" (specifically defined in 6:1083 to include only loans that are secured by first mortgages); or (b) consumer loans secured by a mortgage on residential property not specifically contracted for under the Louisiana Consumer Credit Law.[13]  The mortgage that secures the Williamses' loan is not a first mortgage; rather, it is a second mortgage.  The mortgage also does not meet the criterion in R.S. 6:1083(12)(b) because the loan it secures was made under the Louisiana Consumer Credit Law, evidenced several times in the text of both the note and the mortgage.[14]

The Williamses further argue that the contract interest rate charged by Tower is usurious.

The Louisiana Consumer Credit Law[15] limits contract interest rates.  Lenders may charge interest up to 36% on the first $1,400 loaned; up to 27% on the next amount up to

---

[12] La. R.S. 6:1096(b) states in relevant part: "The parties to a residential mortgage loan, other than a federally related mortgage loan, may agree to…interest in connection with a closed-end credit transaction,…up to an annual percentage rate as computed pursuant to 12 CFR Section 226.22 for closed-end credit…in an amount not to exceed the greater of either twenty-one percent or fifteen percentage points above the Federal Reserve Board of Governor's approved 'Discount Rate'…"

[13] La R.S. 6:1083(12).

[14] Debtors' Exhibits A & C.

[15] La. R.S. 9:3510, *et seq.*

$4,000; up to 24% on the next amount up to $7,000; and up to 21% on the money loaned after the first $7,000.[16]

Tower charged the debtors total contract interest rate of 21.9% on a loan of $17,091.28. Binning, Tower's manager, testified that the 21.9% interest rate was a correct calculation based on the amount borrowed, and the debtors offered no evidence to the contrary. A total contract interest rate of 21.9% is within the limit set by La. R.S. 9:3519, and therefore not usurious.

### The debtors did not prove that Tower disclosed an incorrectly calculated interest rate.

The Williamses also complain that Tower incorrectly calculated – and therefore incorrectly disclosed – the interest rate it charged the debtors. Tower's alleged mistake was in calculating the rate by adding to the financed amount soft costs that should have been excluded from the APR calculation.

The Truth in Lending Act ("TILA")[17] is a disclosure statute enacted by Congress to ensure that creditors make meaningful disclosures to consumers before the consumers commit to an extension of credit. *Bell v. Parkway Mortgage, Inc.*, 309 B.R. 139, 149 (Bankr. E.D. Pa. 2004). It was designed to provide consumers with uniformity in the disclosure of finance costs, to enable them to make easy comparisons among several loan offers. *Id.* at 149. TILA allows debtors "to rescind certain credit transactions that involve their principal dwelling." Truth in Lending, 61 Fed. Reg. 49237, 49237-38 (September 19, 1996), *cited in* Bell v. Parkway, 309 B.R. 139, 149 (2004). This right is available for three days after the consummation of the transaction, and extends for three

---

[16] La. R.S. 9:3519.

[17] 15 U.S.C. §1601, *et seq.*

years from consummation when the creditor fails to properly give required notice of rights or make material disclosures. 15 U.S.C. §1635. The Federal Reserve was charged with the implementing TILA and has done so through Regulation Z,[18] which sets out a detailed method for calculating finance costs. *Rucker v. Sheehy Alexandria, Inc.*, 244 F. Supp. 2d 618 (E.D. Va. 2003). TILA, as implemented by Regulation Z, requires creditors to include or exclude certain fees and charges when computing finance charges for a given loan. *Bell v. Parkway,* 309 B.R. 139, 149 (2004).

Calculation of the correct finance charge, and hence the APR, is an issue of fact. *Wepsic v. Josephson,* 231 B.R. 768 (Bankr. S.D. Cal. 1998) (determination of correct finance charge was issue of material fact precluding summary judgment).

The debtors offered no evidence to support their claim that the interest rate was incorrectly calculated and therefore improperly disclosed. Indeed, Tower alone offered evidence concerning the method of calculating the annual percentage rate.

Binning testified that he followed the requirements of TILA and Regulation Z when he used a computer program to calculate the finance charges for the Williamses' loan. According to Binning, the program calculated an APR of 22.10% for the loan. Binning confirmed the accuracy of that initial calculation using software provided on the website of the Office of the Comptroller of the Currency.

In support of their claim, the Williamses point to the disparity between the contract rate of interest charged and the APR, both set forth on the Combination Promissory Note, Truth-In-Lending Disclosure Statement and Security Agreement.[19] The note reflected that the contract rate of interest charged the Williamses was 21.9%,

---

[18]   12 C.F.R. § 226.

[19]   Debtors' Exhibit A.

although the APR was listed as 22.10%. Binning explained that the contract rate of interest differed from the APR because several additional items (namely, additional fees that must be disclosed under Regulation Z) were added into the calculation. Specifically, Binning testified that approximately $75.00 in fees (including the documentation fee, origination fee and non-filing fee) were included in the amount financed when calculating the APR. Those fees are excluded in calculating the contract rate of interest. Excluding that amount from the sum on which Tower computed the interest resulted in the difference between the contract rate and the APR, according to Binning's testimony. The debtors offered no evidence to refute that testimony.

## CONCLUSION

The Williamses' objection to Tower's claim is not supported by credible evidence, and the debtors have failed to prove that Tower's mortgage should be set aside or its claim disallowed. Accordingly, the debtors' objection to Tower's claim is overruled.

Baton Rouge, Louisiana, September 30, 2005.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE